UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


JEAN L. STANLEY and          )
MICHAEL J. QUIGLEY, Personal )
Representative of the Estate )
of LORETTA CLUNE,            )
                             )
            Plaintiffs,      )
                             )
v.                           )          CIVIL ACTION NO.
                             )          16-cv-12647-DPW
STANLEY T. SCHMIDT and        )
ALEXANDER R. BLACK,          )
                             )
            Defendants.      )

MEMORANDUM AND ORDER
March 28, 2019

This is an action for securities fraud and negligence

brought by Jean Stanley and Loretta Clune, against an investment

advisory company they used — Interinvest Corporation, Inc.

("Interinvest") — and three of its senior executives — Dr. Hans

P. Black ("Dr. Black"), Stanley T. Schmidt, and Alexander R.

Black ("Alexander Black").[1]  Alexander Black now seeks summary

judgment on the claims alleging a violation of the 1934

---

[1] The cases against Defendants Dr. Hans P. Black and Interinvest
were terminated on October 3, 2017, following the entry of a
default judgment and a permanent injunction.  Though the case
against Defendant Stanley T. Schmidt is still pending, it has
been stayed since May 8, 2017, when Mr. Schmidt filed a
suggestion of bankruptcy with this court.  The motion for
summary judgment before me was filed after the entry of default
judgment against Dr. Black and Interinvest, and after Mr.
Schmidt filed for bankruptcy relief, and concerns only the
claims against Alexander Black.

Securities and Exchange Act ("the '34 Act") and common law negligence.

## I. BACKGROUND

### A. *Factual Background*

#### 1. The Parties

Dr. Black is a resident and citizen of Canada.  In 1980, Dr. Black founded Interinvest, an investment company in Boston, Massachusetts.  Interinvest was organized under the laws of the Commonwealth of Massachusetts and was administratively dissolved on June 30, 2017.  At various times, Dr. Black has served as Interinvest's Chairman, President, Chief Compliance Officer ("CCO"), and Chief Investment Officer.  In 2014, he was Interinvest's sole shareholder, President, and Chief Investment Officer.  Additionally, Dr. Black was Plaintiffs' investment adviser at Interinvest.

Alexander Black is Dr. Black's son and began working for Interinvest in 2009.  In March 2013, Alexander Black became the CCO of Interinvest, taking over for Stanley Schmidt.  He also served as President for a period of time between 2013 and 2014.  Alexander Black left Interinvest in August 2014 and has not spoken to his father since then.

Plaintiff Jean Stanley opened accounts with Interinvest in 2000 after she heard "good reports" about Dr. Black through relatives who had also invested with the company.  In the 1980s

and 1990s, Ms. Stanley had worked as a commodities trader and as an execution broker for a hedge fund, though she did not professionally trade securities.  When Ms. Stanley first invested with Interinvest, she stated specifically that she "had no tolerance for high risk" and wanted a stable, relatively safe, investment strategy.  Through 2010, Ms. Stanley stated that she was satisfied with how her portfolio was being managed, and that she met with Dr. Black annually to discuss her account generally, though she ultimately gave Dr. Black and Interinvest discretion to make investment decisions for her accounts.  These conversations slowly decreased and ultimately stopped after 2010.

   Plaintiff Loretta Clune[2] opened accounts with Interinvest in 2006.[3]  Like Ms. Stanley, Ms. Clune had heard of Interinvest through relatives and decided to invest with the company on the recommendation of her nephew.  Ms. Clune did not understand

---

[2] Ms. Clune passed away on September 28, 2018.  On November 15, 2018, Michael Quigley was appointed as the personal representative of her estate by the Probate Division of the Circuit Court for Palm Beach County, Florida, where Ms. Clune lived.  On January 16, 2019, I allowed Mr. Quigley in his representative capacity to be substituted for Ms. Clune as a Plaintiff in this case.  To avoid confusion, this memorandum will continue to refer to Ms. Clune, rather than to Mr. Quigley, as the co-plaintiff of Ms. Stanley.
[3] There is some dispute about this date.  Plaintiffs claim that Ms. Clune received invoices from Interinvest at least as early as October 2005.  In any event, the date is immaterial for purposes of resolving the motion before me.

investments and her brother, John Quigley, an accountant, received copies of her monthly account statements. Though Ms. Clune's accounts lost value in 2008, the decline in performance did not cause her concern because it was in line with the state of the market at the time; ultimately, Ms. Clune invested more money with Interinvest in 2010.

## 2. Interinvest's Disclosures and Form ADVs

Between 2011 and 2014, Alexander Black began participating in the preparation of Interinvest's Form ADV, the form used by investment advisors to register simultaneously with the Securities and Exchange Commission ("SEC") and state-level securities authorities. During this time, Dr. Black did not initiate changes to Interinvest's Form ADV, and all changes to Interinvest's Form ADV disclosures were initiated by Alexander Black and Mr. Schmidt. Dr. Black also consistently "denied ever getting compensation from" any of the companies for which he served on the board. Alexander Black testified that he asked Dr. Black if he ever received compensation from those companies and Dr. Black claimed that he did not, though when pressed, Dr. Black ultimately conceded that he received stock options. Alexander Black also testified that he took the initiative to look up filings for the companies on which Dr. Black served on the board to determine whether and to what extent Dr. Black had received compensation. In this manner, he discovered that Dr.

Black received $12,000 from one of the companies.  This
information was subsequently disclosed on Interinvest's Form ADV
in 2013.

In addition, Alexander Black also testified that he and Mr.
Schmidt pushed Dr. Black to disclose relevant regulatory
matters.  In 2011, Dr. Black disclosed to Alexander Black and
Mr. Schmidt the existence of an Autorite des Marche Financiers
("AMF") action against a Canadian company controlled by Dr.
Black that had previously operated as an investment advisory
firm.  This action was subsequently disclosed on Interinvest's
Form ADV.  Alexander Black had actual knowledge of one
regulatory matter concerning Dr. Black during the time that they
were employed by Interinvest, though Dr. Black was involved in
two others.

At some point between 2011 and 2014, Dr. Black also told
Alexander Black and others that he had previously been involved
in several civil lawsuits that were resolved through out-of-
court settlements.  Dr. Black stated that these actions were
unrelated to the business of Interinvest and were instead
related to currency trading losses he suffered in 2005.[4]

---

[4] Dr. Black consulted Interinvest's counsel, Matthew Dallett, in
January 2010 about two lawsuits that had been filed against him
relating to a hedge fund in Bermuda.  Dr. Black stated that in
reading the Form ADV instructions, he did not believe that the
lawsuits were subject to disclosure.  Attorney Dallett wrote
back to Dr. Black the same day and stated, "I agree that, as

Alexander Black testified that he consulted with Interinvest's counsel at Edwards, Angell, Palmer & Dodge in Boston to verify Dr. Black's position that settled civil actions did not need to be reported on Interinvest's Form ADV and to determine whether any legal actions needed to be disclosed, and was told that disclosure was unnecessary. However, Interinvest's counsel did not provide a formal opinion letter.

Alexander Black testified that, while he was at Interinvest, he was not aware of any additional director compensation, regulatory actions against Dr. Black, or lawsuits concerning Dr. Black other than those that were disclosed in Interinvest's Form ADV.

### 3. Plaintiffs' Investments

In 2012, the risk profile of Plaintiffs' investment accounts with Interinvest began to change. By March 31, 2013, stocks selling for less than $1.00 per share, known as penny stocks, made up 50% of Ms. Clune's stock portfolio and 43% of Ms. Stanley's portfolio. Plaintiffs' expert has testified that "the primary cause of the damages was the transition of

---

long as these are private plaintiffs (not a regulatory authority) and assuming (i) they have not alleged any breach of the Bermuda Securities Regulations QL111.Y.[,] other investment-related statute or regulation and (ii) they are seeking only money damages, not injunctive relief, there is no reasonable basis for a "yes" answer under Item 11.H(2)." These emails did not constitute a formal opinion letter and were not sent to Alexander Black.

historically 'Balanced' accounts owned by the Plaintiffs, to high-risk accounts concentrated in a handful of Nano-cap stocks beginning in 2012." These penny stocks included shares in Amorfix, Tyhee Gold Corp., Wi2Wi, and Williams Creek Gold (collectively, "the portfolio securities"), among others. All four companies were Canadian corporations and were publicly traded on either the Toronto Stock Exchange or the TSX Venture Exchange. Dr. Black was affiliated with all four portfolio companies and served on their Boards of Directors. He also received a cash fee from Tyhee Gold Corp. and stock options in the other three corporations as compensation for his work as a director.

In December 2013, Dr. Black authorized and initiated Ms. Clune's purchases of unsecured notes in Wi2Wi, a Canadian corporation for which he was a board member. In January 2014, he did the same for Ms. Stanley. That same month, both Ms. Stanley and Ms. Clune contacted Interinvest to inquire about the purchase of Wi2Wi shares. Internal emails from Interinvest suggest the trades were explained to both Plaintiffs, though the content of those conversations is not part of the record.

The Wi2Wi notes did not appear in either Plaintiff's account until April 2014. Ms. Stanley and Ms. Clune again contacted Interinvest in July 2014 and both testified that they

spoke to Alexander Black at length about their portfolios. Alexander Black does not recall speaking to Ms. Clune.

### 4.  Policy Changes and Regulatory Actions

In early 2014, Alexander Black sent out a memo instructing Dr. Black that Interinvest should not be making private placement transactions without clients' express written consent. In March 2014, Alexander Black also attempted to cancel Dr. Black's corporate credit cards.  He also sent another memo to employees and directors of Interinvest instructing Dr. Black to cease trading in securities of entities for which he sat on the board of directors.  However, Interinvest continued to send "Dear Friends" emails to its clients, promoting the portfolio securities at issue in this case.

Around the same time, the Securities and Exchange Commission ("SEC") began an audit or examination of Interinvest. During the audit, Dr. Black provided misleading information to the SEC.  In a note dated March 14, 2014, Dr. Black led the SEC to believe that he had only been involved in one litigation matter.  In April 2015, Ms. Clune received a letter from State Street Bank, the Custodian of her account, that the New Hampshire Bureau of Securities Regulation had started an enforcement action against Interinvest, Dr. Black, and Alexander Black on the basis of, *inter alia*, allegations of securities fraud.

## B.   *Procedural Background*

Plaintiffs filed the complaint in this case on December 30, 2016.  Of the four named Defendants in the case, only Mr. Schmidt[5] and Alexander Black remain.  The case against Interinvest Corp. and Dr. Black concluded on October 3, 2017 pursuant to a default judgment issued against both.

Alexander Black has filed a motion for summary judgment on Plaintiffs' claims under the '34 Act and for negligence.

During a motion hearing on June 13, 2018, I allowed the parties an opportunity to file additional materials specifically regarding the question of scienter.

---

[5] Though Mr. Schmidt is still formally a defendant in this case, proceedings against him have been stayed in this court since May, 2017, when Mr. Schmidt filed a petition for Chapter 13 bankruptcy in the District of Vermont.  *See in re* Stanley T. Schmidt, Bankruptcy Petition No. 17-bk-10173.  The bankruptcy filing triggered an automatic stay of this proceeding as to Mr. Schmidt, pursuant to 11 U.S.C. § 362(1).  The Plaintiffs in this case filed a notice of a claim against the bankruptcy estate and initially objected to a proposed plan of reorganization, which did not account for their claims.  *See id*. Dkt. No. 29 (D. Vt. June 9, 2017).  Plaintiffs' claims against the estate were for the amount in damages claimed in the present litigation and were premised on the argument that Mr. Schmidt was liable to them for negligence.  *See id*.  Both Mr. Schmidt and the Bankruptcy Trustee have objected to the Plaintiffs' claims against the estate.  *Id*. at Dkt. No. 34 (D. Vt. Aug. 1, 2017), Dkt. No. 35 (D. Vt. Aug. 1, 2017), Dkt. No. 55 (D. Vt. Feb. 20, 2018).  A hearing on their claim has been continued until this motion has been resolved.  *Id*. at Dkt. No. 72 (D. Vt. Aug. 18, 2018)  At this juncture, it seems likely that the negligence claims against Mr. Schmidt will be resolved by the bankruptcy court and, by extension, the District Court for the District of Vermont, in the process of resolving the bankruptcy matter.  *See generally, Stern* v. *Marshall*, 564 U.S. 462 (2011).

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." FED. R. CIV.
P. 56(a). A fact is material if it "might affect the outcome of
the suit under the governing law," and a dispute is "genuine" if
"the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." *Anderson* v. *Liberty Lobby,
Inc.*, 477 U.S. 242, 248, (1986).

Generally, "a party seeking summary judgment bears the
initial responsibility of informing the district court of the
basis for its motion, and identifying those portions of [the
record] which it believes demonstrate the absence of a genuine
issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U.S.
317, 323 (1986). Once it has made such a showing, the burden
shifts to the nonmovant to "present definite, competent evidence
to rebut the motion" and show a "trialworthy issue persists,"
especially on issues where the nonmovant bears the ultimate
burden of proof. *Vineberg* v. *Bissonnette*, 548 F.3d 50, 56 (1st
Cir. 2008) (internal citations and quotations omitted).

When assessing the merits of a motion for summary judgment,
"it is not for the court . . . to weigh the evidence but to
determine whether there is a genuine issue for trial." *Estrada*
v. *Rhode Island*, 594 F.3d 56, 62 (1st Cir. 2010). "Ruling on

[a] party's motion, the court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party."  *Id*.  The standard requires that the nonmovant do more than "rest upon improbable inferences, conclusory allegations, or rank speculation;" instead, she must provide "submissions of evidentiary quality" to meet her burden. *Vineberg*, 548 F.3d at 56; *see also Iverson* v. *City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

## III. ANALYSIS

### A.    *Count I: Securities Fraud*

Count I of Plaintiffs' complaint asserts a claim under section 10(b) of the '34 Act and its implementing regulations for securities fraud.  *See* 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10(b)(5).  Plaintiffs allege that Alexander Black, by virtue of his position as CCO, had a duty to investigate and disclose information regarding Dr. Black's involvement in litigation and regulatory actions and the fact that Dr. Black received substantial compensation from various portfolio companies.  His failure to do so, they allege, constitutes a violation of section 10(b) of the '34 Act.

The '34 Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase and sale of any security . . . any manipulative device or contrivance," and gives the Securities and Exchange Commission ("SEC") the power

11

to promulgate rules to enforce this provision. 15 U.S.C. § 78j(b). Pursuant to this provision, the SEC has promulgated Rule 10b-5, which makes it unlawful for any person "by the use of any means or instrumentality of interstate commerce . . ." to do any of the following:

> (a) To employ any device, scheme, or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or,
> (c) To engage in any act, practice, or course of business.

17 C.F.R. § 240.10b-5.

Though not made explicit in the text of the statute, courts have consistently read section 10(b) of the '34 Act and Rule 10b-5 together to imply "a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharmaceuticals, Inc*. v. *Broudo*, 544 U.S. 336, 341 (2005). To succeed on a section 10(b) claim, a plaintiff must show that: (1) there was "a material misrepresentation (or omission); (2) the defendant had "scienter, i.e., a wrongful state of mind;" (3) the alleged wrongful conduct occurred in "connection with the purchase or sale of a security;" (4) there was "reliance;" (5) the plaintiff suffered economic loss; and, (6) "loss causation, i.e., a causal connection between the material misrepresentation and the loss."

12

*Id.* (internal citations and quotations omitted).

Alexander Black does not contest that there was a material misrepresentation that Plaintiffs relied upon; nor does he contest that the Plaintiffs suffered economic loss. Instead, his motion for summary judgment rests on his contention that the remaining three elements are not met – that the transaction was not made in connection with the purchase or sale of security; that he lacked the requisite scienter; and that there is no loss causation. He also argues that Plaintiffs' claims are time barred.

I address each argument in turn beginning with the threshold argument regarding the statute of limitations.

1.    The Statute of Limitations

As a preliminary matter, Alexander Black argues that Plaintiffs' claims under section 10(b) are time barred because they were brought more than two years after Plaintiffs received the 2014 Form ADV. A claim for relief under section 10(b) must be brought "no later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or, (2) 5 years after such violation." 28 U.S.C. § 1658.

Under the statute, a cause of action accrues either "when the plaintiff did in fact discover" the violation or when "a reasonably diligent plaintiff would have discovered the facts constituting the violation – whichever comes first." *Merck &*

*Co.* v. *Reynolds*, 559 U.S. 633, 637 (2010).  In determining whether a "reasonably diligent plaintiff" would have discovered the alleged fraud, the Supreme Court has indicated that "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating."  *Id*. at 653.  Those concepts do not, however, necessarily mark the moment at which the cause of action begins to accrue.

The limitations period begins to run only when "the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter."  *Id.; see also Firstbank Puerto Rico, Inc.* v. *La Vida Merger Sub.*, 638 F.3d 37, 39 (1st Cir. 2011).  The First Circuit has acknowledged that "the doctrine of fraudulent concealment operates to toll the statute of limitations where the party injured by the fraud remains in ignorant of it" despite the plaintiff's own diligence.  *Maggio* v. *Gerard Freezer & Ice Co.,* 824 F.2d 123, 127-28 (1st Cir. 1987).  Thus, while so-called "storm warnings" may trigger the plaintiff's obligation to investigate, they may not trigger the statute of limitations if evidence of the fraud was intentionally kept from the plaintiffs.  *Id*.

Here, Alexander Black argues that the Plaintiffs' cause of action began to accrue at the latest in April 2014, when Interinvest disclosed that Dr. Black received cash compensation, stock options, and expense reimbursement from companies on whose boards he served, as well as that he had been the subject of a regulatory action by Canadian securities regulators in 2007. Indeed, some of the same information had been disclosed earlier on the 2013 ADV. Because Plaintiffs did not file suit until December 30, 2016 — some 32 months after he says the cause of action accrued under the discovery rule — Alexander Black argues the Plaintiffs' securities fraud claim is time-barred.

The facts regarding earlier disclosure are insufficient to trigger the limitations period. Though the 2013 Form ADV (and, by extension, the 2014 Form ADV) listed Dr. Black's 2007 fine in Quebec by the AMF, neither said anything more with regard to Dr. Black's disciplinary history. Moreover, neither listed any of the private suits brought against Dr. Black, or gave Plaintiffs any indication that those suits even existed. The fact that Plaintiffs' accounts contained penny stocks as early as 2011 also does not trigger the statute of limitations. In January 2014, both Ms. Stanley and Ms. Clune specifically contacted Dr. Black and sought reassurances about their investments, which they received. Plaintiffs argue that up to April 2015, they also continued to receive "Dear Friends" letters from

Interinvest, extolling the virtues of investing in the very securities at issue in this litigation, including Amorfix Life Sciences, LakeShore Gold, Tyhee Gold, and Williams Creek Gold.

Accordingly, Plaintiffs have identified sufficient facts in the record to raise the inference that a "reasonably diligent investor" would not have discovered the violation here earlier than December, 2014, two years before this suit was filed, even if she would have been put on inquiry notice to some degree by the April 2014 Form ADV. Consequently, the claims are not time-barred.

### 2. In Connection with the Purchase and Sale of Securities

To prevail on a claim brought under section 10(b), Plaintiffs must demonstrate that the alleged misrepresentation or omission was made in connection with the purchase or sale of a security and falls within the territorial scope of the '34 Act. *See generally*, *Dura Pharmaceuticals, Inc.*, 544 U.S. 336; *Morrison* v. *National Australian Bank, Ltd.*, 561 U.S. 247 (2010).

I address each prong in turn.

#### a. *In Connection with the Purchase and Sale*

For a plaintiff to have a cause of action under the '34 Act, the alleged fraud must have been "in connection with the purchase or sale of a security." *Dura Pharmaceuticals*, 544 U.S. at 341. Traditionally, this requirement was used to limit the plaintiffs' class to only "actual purchasers and sellers,"

16

thereby preventing investors who had never held an ownership stake in the securities at issue from filing suit. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 731 (1975) (affirming the rule established in *Birnbaum* v. *Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)).

Beyond this limitation, however, the Supreme Court has consistently read the "in connection with" requirement "flexibly to effectuate [the statute's] remedial purposes." *S.E.C.* v. *Zandford*, 535 U.S. 813, 819 (2002). Though the requirement "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)," the requirement that the transaction be "in connection with" the purchase or sale of securities is not a restrictive one. *Id*. at 820. To this end, it is enough "that the fraud alleged 'coincide' with a securities transaction – whether by the plaintiff or by someone else." *Merrill Lynch, Pierce, Fenner & Smith* v. *Dabit*, 547 U.S. 71, 85 (2006).

Here, the alleged fraudulent misrepresentation related to Dr. Black's failure to disclose information on his Form ADV about his connection to portfolio companies and his prior involvement in litigation. Alexander Black does not contest that the Form ADV was misleading or that Dr. Black's misstatements were material, in the sense that they necessarily influenced the Plaintiffs' willingness to invest with

17

Interinvest and to enter into (or authorize) specific transactions. *See Basic, Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988). I find the deception, therefore, to have been "in connection with" the purchase and sale of securities. *See Zandford*, 535 U.S. at 822.

The Plaintiffs contend that by virtue of his position as CCO and as a Portfolio Manager at Interinvest, Alexander Black was necessarily complicit in these misstatements; his conduct, they argue, falls within the scope of the "in connection with" requirement. While Alexander Black's asserted lack of knowledge as to the deception may go to scienter, it does not change the fact that the alleged deception was made in connection with the purchase or sale of securities. Alexander Black proffered no evidence to suggest that the deception did not, in fact, relate to a securities transaction. Consequently, I find that the "in connection with" requirement has been met here.

> *b.* *In a Domestic Transaction*

It is not enough for the material misrepresentation at issue to have been "in connection with" a securities transaction. The transaction itself must also fall within the territorial scope of the '34 Act. To do so, it must be a transaction "that the statute seeks to regulate," meaning the "parties or prospective parties" are the ones "the statute seeks

to protect." *Morrison* v. *National Australia Bank Ltd*., 561 U.S. 247, 267 (2010).

Under Supreme Court precedent, section 10(b) only applies to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id*. "With regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales" – transactions effectuated by American investors on American soil. *Id*. at 268.

Alexander Black argues that Plaintiffs' claims fall outside the scope of the '34 Act because the securities at issue – Amorfix, Tyhee, Wi2Wi, and Williams Creek Gold – are all related to Canadian companies and sold exclusively on Canadian exchanges. However, Alexander Black's argument reads *Morrison* too narrowly. Though the securities themselves are traded on foreign exchanges, the transactions at issue are domestic. Both Ms. Stanley and Ms. Clune lived in Massachusetts during the relevant time period, and Interinvest was headquartered in Boston. Alexander Black has provided no evidence that the securities transactions at issue were not effectuated through Interinvest's Boston office. Indeed, Ms. Stanley and Ms. Clune are exactly the kinds of people the '34 Act was designed to protect – domestic investors entering transactions through a domestic broker-dealer that is regulated by the SEC. *See Ernst*

& *Ernst* v. *Hochfelder*, 425 U.S. 185, 195 (1976); *see also*
*Zandford*, 535 U.S. at 822.

I find and conclude the transactions at issue here fall
within the ambit of the '34 Act.

### 3. Scienter[6]

The core of Alexander Black's motion for summary judgment
rests on his contention that he cannot be held liable under
section 10(b) because he lacked the requisite scienter.  The
Supreme Court has consistently held that "§ 10(b) was addressed
to practices that involve some element of scienter and cannot be
read to impose liability for negligent conduct alone." *Ernst &*
*Ernst*, 425 U.S. at 201.  In this context, "'scienter' refers to
a mental state embracing intent to deceive, manipulate, or
defraud," and requires more than negligent nonfeasance.  *Id*. at
193 n. 12.  Scienter also requires a showing that the defendant
is someone who is primarily liable for the deceptive act, a
status which can, as the Supreme Court clarified yesterday,
include those who knowingly disseminate false or misleading
information.  *See Lorenzo* v. *S.E.C.*, —S. Ct.—, 2019 WL 1369839
at *4 (March 27, 2019).

---

[6] The Plaintiffs did not raise any affirmative arguments
concerning scienter in their original opposition to the motion
for summary judgment.  They did, however, address the issue in
their response to the summary judgment motion.  Following my
instructions, the Plaintiffs also filed a supplemental brief
focused on the question of scienter.

To prove scienter, a plaintiff must show that the defendant "consciously intended to defraud, or that [he] acted with a high degree of recklessness." *Ezra Charitable Trust* v. *Tyco Intern., Ltd.*, 446 F.3d 1, 6 (1st Cir. 2006); *see also S.E.C.* v. *Ficken*, 546 F.3d 45, 47 (1st Cir. 2008). Specifically, "[t]he plaintiff must prove that defendants knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors." *Geffon* v. *Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001).[7]

In the absence of affirmative knowledge or intent, "reckless statements of misleading facts may be actionable under 10b-5." *Id.* In this context, recklessness requires "'a highly unreasonable omission, involving not merely simple, or even inexcusable[ ] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" *Ficken*, 546 F.3d at 47-48 (quoting *S.E.C.* v. *Fife*, 311 F.3d 1, 9-10 (1st Cir. 2002)).

Alexander Black argues that there is no evidence in the record from which a reasonable jury could conclude that he acted

---

[7] In this context, the defendant's silence may also be fraudulent if the defendant was under an affirmative duty to disclose information and failed to do so. *Chiarella* v. *United States*, 445 U.S. 222, 232 (1980).

with the requisite scienter.  The Plaintiffs' case against Alexander Black rests on their contention that, as the CCO of Interinvest, he was ultimately responsible for the deceptive Form ADV filed by Dr. Black and for the securities held in Ms. Stanley's and Ms. Clune's accounts.  Indeed, the Plaintiffs argue — and Alexander Black does not contest the fact — that he was aware of unregistered and unauthorized transactions and that he encouraged Dr. Black to disclose any further involvement with the portfolio companies or in litigation.

While the evidence of Alexander Black's efforts within Interinvest to limit Dr. Black's misconduct is not, in and of itself, dispositive of the question of liability, it does speak to his intent to deceive or defraud.  Despite having ample opportunity to do so, the Plaintiffs here have provided no evidence that Alexander Black affirmatively intended to mislead them, or that he acted in a way that constituted an "extreme departure from the standards of ordinary care."  *Ficken*, 546 F.3d at 47–48.

Alexander Black attested that he asked Dr. Black if he ever received compensation from these companies and Dr. Black claimed that he did not.  When Alexander Black pressed Dr. Black on the compensation issue, Dr. Black finally conceded that he received stock options, after which Alexander Black independently looked at the filings for the relevant companies and disclosed

information that he found on Interinvest's Form ADV.  Alexander
Black also affirmatively asked Dr. Black to share any legal
actions that may need to be disclosed, and Dr. Black divulged
that he had some legal issues in the past but that they were
unrelated to the business of Interinvest.  The only action
disclosed to him by Dr. Black was the 2007 fine by the AMF,
which was consistently disclosed in the Form ADVs.  While
Alexander Black's failure to investigate further may require
further analysis from a negligence perspective, it was not such
an extreme departure from the ordinary standard of care as to
raise an inference of scienter here.

Although Plaintiffs list specific amounts of compensation
allegedly paid to Dr. Black from these companies in 2014 in the
complaint, they fail to produce any evidence to indicate that
Alexander Black had any knowledge of these amounts.  Nor have
they provided any evidence that Alexander Black acted recklessly
by failing to investigate further.  Based on the evidence of
record, then, I find that there is no genuine issue of material
fact with respect to Alexander Black's mental state.  He did not
possess the requisite scienter and therefore, cannot be held
liable under section 10(b) of the '34 Act.

4. <u>Loss Causation</u>[8]

For the sake of completeness, I will briefly address the question of loss causation, since Alexander Black raised the issue in his original motion for summary judgment.  To prove loss causation in a securities fraud suit, plaintiffs "bear the burden of showing that [their] losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cit. 2014) (quoting *in re Williams Sec. Litig.,* 558 F.3d 1130, 1137 (10th Cir. 2009)).

Here, Plaintiffs allege, and Alexander Black does not contest, that "Dr. Black and Interinvest's actions have caused, and continue to cause, Plaintiffs substantial losses, damages and harm in an amount to be determined."  Nor does Alexander Black contest the fact that the misrepresentations were material, and proximately caused Plaintiffs' losses. Plaintiffs' expert witness opines that "[t]he primary cause of the damages was the transition of historically 'Balanced'

<hr>

[8] As with scienter, the Plaintiffs here did not raise any affirmative arguments concerning loss causation in their original opposition to the motion for summary judgment.  They did, however, address the issue in their response to the summary judgment motion.  Moreover, Alexander Black does not contest the fact that Plaintiffs suffered economic loss.  His only argument is that the loss was not proximately caused by his actions.

accounts owned by the Plaintiffs, to high-risk accounts concentrated in a handful of Nano-cap stocks beginning in 2012." On this record, plaintiffs have demonstrated that their loss was caused by the investment decisions implemented by Dr. Black, in contravention of Plaintiffs' express instructions and statements concerning their investment goals.

Alexander Black's argument concerning loss causation rests on his contention that he, personally, did not make any material misrepresentations or take any investment decisions that contributed to the Plaintiffs' injury. This argument reads the loss causation requirement, and Plaintiffs' allegations, too narrowly. Plaintiffs' claims against Alexander Black rest on their contention that he should have known, by virtue of his position as CCO, about the investment decisions and the material misstatements. While his lack of actual knowledge or involvement goes to scienter, it does not demonstrate that there was no causal connection between the alleged misrepresentation and Plaintiffs' injury.

At the very least, the record indicates that there is a triable issue of fact as to the causal link between Alexander Black's alleged failure to investigate and disclose information and Plaintiffs' loss. However, because I have already determined as a matter of law that Alexander Black lacks the

requisite scienter, I will grant summary judgment to him on the Plaintiffs' section 10(b) claim.

**B.    *Count IV: Negligence***

In addition to their claim under the '34 Act, the Plaintiffs assert a claim for state-law negligence against Alexander Black.  The negligence claim rests on the same factual circumstances as the claim under the '34 Act – Plaintiffs allege that, as CCO, Alexander Black had an obligation to supervise Interinvest employees, including Dr. Black, ensure that all proper disclosures were made to Interinvest clients with respect to material conflicts of interest, compensation arrangement, and legal and regulatory events, and ensure that securities traded in client accounts were suitable for those clients and in conformity with their stated investment objectives.  By failing to do so, Alexander Black breached a duty of care owed to the Plaintiffs, resulting in substantial financial loss.

Under Massachusetts law, a plaintiff asserting a claim for negligence has to prove the existence of: "(1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) causation; and (4) actual loss by the plaintiff." *Everest Nat'l Ins. Co.* v. *Boston Water & Sewer Comm'n*, 2012 WL 90450, at *3 (D. Mass. Jan. 10, 2012).  "[T]he question of negligence is usually a factual question for the jury." *Id.*; *see also Nelson* v. *Mass. Port Authority*, 771 N.E.2d

209, 211 (Mass. App. Ct. 2002) (citing *Altman* v. *Aronson*, 121
N.E.2d 505, 506 (Mass. 1919)).  Furthermore, a claim for
negligence must be brought "within three years next after the
cause of action accrues."  M.G.L. c. 260 § 2A.

Here, Alexander Black contends that any negligence claims
based on the suitability of investments and failure to supervise
Dr. Black are time-barred.  Furthermore, Alexander Black
maintains that Plaintiffs cannot demonstrate that he owed a duty
to them and that they cannot demonstrate any causal connection
between the alleged negligence and their alleged damages.

I will address each argument in turn beginning with the
threshold statute of limitations issue.

1.   Statute of Limitations

Under Massachusetts law, a tort claim must be brought
within three years of the date when the cause of action accrues.
M.G.L. c. 260 § 2A.  Though ordinarily a cause of action for
tort begins to accrue when the injury occurs, the Massachusetts
Supreme Judicial Court has "recognized the unfairness of a rule
that holds that the statute of limitations has run even before a
plaintiff knew or reasonably should have known she may have been
harmed by the conduct of another."  *Bowen* v. *Eli Lilly & Co.,
Inc.*, 557 N.E.2d 739, 741-42 (Mass. 1990).  Consequently, the
SJC has adopted a "discovery rule," which states that "certain
causes of action based on inherently unknowable wrongs do not

accrue until the plaintiff learns, or reasonably should have learned that he has been harmed by the defendant's conduct." *White* v. *Peabody Construction Co., Inc.*, 434 N.E.2d 1015, 1020 (Mass. 1982).

The Massachusetts "discovery rule" largely parallels the rule used to determine when a cause of action under the '34 Act begins to accrue. Indeed, as with claims under the '34 Act, Massachusetts law recognizes that the doctrine of fraudulent concealment operates to toll the statute of limitations. *Stetson* v. *French*, 72 N.E.2d 410, 412 (Mass. 1947). In the context of fraud, a failure to reveal information may be sufficient if "there is a duty to reveal" or disclose that information. *Id*. However, "once possessed of actual or constructive knowledge, a plaintiff . . . cannot simply wait for an unfavorable return before asserting his rights." *Genovesi* v. *Nelson*, 5 N.E.3d 571, 576 (Mass. App. Ct. 2014). Ultimately, the question of when a plaintiff should have known and when a plaintiff should have asserted her rights, are questions of fact "often unsuited for summary judgment" unless "the facts regarding discovery of harm are undisputed." *Mass. Housing Opportunities Corp.* v. *Whitman & Bingham Associates, P.C.*, 983 N.E.2d 734, 737 (Mass. App. Ct. 2013).

Those facts are not undisputed here, and the parties' arguments with respect to the statute of limitations under

Massachusetts law rest on the same factual premises as their argument with respect to the statute of limitations under section 10b-5.

I decline based on the record before me to grant summary judgment on this basis, for essentially the same reasons I have concluded that the statute of limitations under the '34 Act is not a bar to Plaintiffs' claims.

As with the '34 Act claim, there are sufficient facts in the record from which a reasonable jury could find that a reasonable Plaintiff should have known that they had a negligence cause of action no earlier than December 2014.  I will not, therefore, grant summary judgment on the basis that Plaintiffs' negligence claims are time-barred.

### 2.   Duty and Breach

The core of Alexander Black's motion for summary judgment with respect to his negligence claim rests on his contention that he did not owe Plaintiffs any legal duty.  He was not, he argues, the Plaintiffs' investment advisor or portfolio manager, and he did not personally make investment decisions for Plaintiffs.

#### a.   Duty

Under Massachusetts law, "a simple broker-customer relationship is not fiduciary in nature, even if the broker has encouraged the trust of an unsophisticated customer;" however, a

"full relation of principal and broker" is a fiduciary one.
*Patsos* v. *First Albany Corp.*, 741 N.E.2d 841, 848 (Mass. 2001).
"In determining the scope of the broker's fiduciary obligations,
courts typically look to the degree of discretion a customer
entrusts to his broker:" the more discretionary an account, and
the more involvement a broker or his associate have with the
account, the more likely it is for a broker to be considered a
fiduciary. *Id*. at 849-50. Ultimately, the question of whether
there is a fiduciary relationship is a question of fact. *Id*. at
851.

Here, Alexander Black argues that, as CCO of Interinvest,
he was not responsible for the client accounts and therefore, is
not a fiduciary under this rule in Massachusetts. He did not
place trades on behalf of any of the clients. Plaintiffs do not
contest this, though they do argue that, on at least one
occasion, they individually spoke to Alexander Black about their
investments. However, these conversations are insufficient to
establish a fiduciary duty between Alexander Black and the
Plaintiffs under Massachusetts law, especially since he was not
their broker and did not place trades on their behalf. *See*
*Saunwin Int'l Equities Fund, LLC* v. *Donville Kent Asset*
*Management*, 2018 WL 3543533 at *10 (D. Mass. July 20, 2018).

The absence of a fiduciary duty owed to Plaintiffs as an
investment advisor does not, however, relieve Alexander Black of

liability.  As the SJC has held, negligence is broader than

breach of fiduciary duty: it is a "want of diligence

commensurate with the requirements of the duty at the moment

imposed by the law." *Nelson*, 771 N.E.2d at 211 (citing *Altman*,

121 N.E.2d at 506).  The duty owed, in this context, is the

"degree of care, vigilance, and forethought which . . . a person

of ordinary caution and prudence ought to exercise under the

particular circumstances." *Id*.  Ordinarily, there is no general

"duty of reasonable care to protect a plaintiff from the actions

of third parties absent the existence of a special

relationship." *Saunwin Int'l Equities Fund, LLC*, 2018 WL

3543533 at *18.  However, Massachusetts courts have, in some

circumstances, imposed this kind of duty to prevent a

misrepresentation "where a professional . . . knows a third

party is relying on her statements." *Fine* v. *Sovereign Bank*,

634 F. Supp. 2d 126, 136 (D. Mass. 2008).  A similar duty is

imposed on individuals who are considered responsible for making

certain statements or disclosures by law and could reasonably

have discovered that the statements were misleading or false.

*See e.g.*, *Marram* v. *Kobrick Offshore Fund*, 809 N.E.2d 1017,

1031-32 (Mass. 2004); *Cooperman* v. *Individual, Inc.*, 171 F.3d

43, 50 (1st Cir. 1999).

Consequently, even though Alexander Black is not a

fiduciary, he may still be held liable for negligence if a

reasonable trier of fact could find that, by virtue of his position as CCO of Interinvest, he had a special relationship to the Plaintiffs such that he knew Plaintiffs were relying on his statements to them, and he failed to take reasonable steps to ensure those statements were accurate.  I find that Plaintiffs have made such a showing here.

As CCO, and subsequently as President, Alexander Black was responsible under both federal law and under Interinvest's policies, for adopting and implementing policies and procedures to prevent violations of securities laws and to oversee their implementation.[9]  A reasonable fact-finder could decide that, by virtue of that position, Alexander Black had had an affirmative duty to monitor the investment practices and to investigate and report potential violations of federal securities laws.  At the very least, a reasonable fact-finder could determine that, because Alexander Black was, by law, responsible for implementing policies and procedures to prevent fraud and was

---

[9] Indeed, federal regulations promulgated under the 1940 Investment Advisers Act require investment advisers, such as Interinvest, to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation, by [the company] and [its supervised persons, including employees] of the Act," and to designate an individual supervised by the company as "responsible for administering the policies and procedures" adopted under the regulation.  17 C.F.R. § 275.206(4)-7; *see also* 17 C.F.R. § 275.204A-1.  Federal regulations promulgated under the 1940 Investment Company Act carry the same requirements.  *See* 17 C.F.R. § 270.38a-1.

responsible, at least in part, for producing the Form ADVs and other disclosure statements on behalf of Interinvest, he reasonably knew that the Plaintiffs relied on his statements and owed them a duty to take reasonable care to avoid misrepresentation. *See Fine*, 634 F. Supp. 2d at 136.

Consequently, I find that there is a genuine issue of material fact as to whether Alexander Black owed Plaintiffs a duty of care under state negligence law.

b.    *Breach of Duty*

There is also a genuine issue of material fact as to whether Alexander Black acted reasonably to avoid misrepresentation or to supervise Dr. Black. Alexander Black has argued that he exercised due care by asking Dr. Black if he received compensation from various portfolio companies, pressing him on the issue, and independently investigating his father's affiliation with those companies. He also ensured that the information he discovered was reported on Interinvest's Form ADV. Moreover, Alexander Black affirmatively asked Dr. Black to disclose any legal actions, and reported his 2007 fine by the AMF on the Form ADV.

Alexander Black did not, however, conduct any further investigations into disciplinary actions involving Dr. Black, and Plaintiffs have provided evidence that Dr. Black was fined twice more by the AMF, once in March 2008 and once in July 2012.

33

Nor did Alexander Black make any inquiries into Plaintiffs'
accounts, though, as Plaintiffs argue, he was in a position to
do so by virtue of his role as CCO.  Taken together, these facts
read in the light most favorable to the Plaintiff, can be read
to show that Alexander Black did not act with the "degree of
care, vigilance, and forethought" expected of "a person of
ordinary caution and prudence" in his position as the CCO and,
ultimately, the President of an investment company.  *See Nelson*,
771 N.E.2d at 211.

A reasonable fact-finder could conclude that Alexander
Black should have conducted a more searching inquiry into Dr.
Black's past, and should have examined Plaintiffs' accounts more
carefully.  Consequently, there is a genuine issue of material
fact as to the question of duty and breach that must go to a
jury.

### 3.   Loss Causation

As with their claim under the '34 Act, Plaintiffs, to
succeed on their negligence claim, must be able to show that
"there [is] some reasonable connection between the act or
omission of the defendant and the damage which the plaintiff has
suffered."  *See generally* Prosser and Keeton, Torts § 41, at 263
(5th ed 1984); *see also*, *e.g.*, *Delaney* v. *Reynolds*, 825 N.E.2d
554, 556-57 (Mass. App. Ct. 2005).

The basis for finding causation on the negligence claim is virtually identical to the basis for finding causation with respect to the claim under the '34 Act – Dr. Black and Interinvest made material misrepresentations to Plaintiffs about Dr. Black's background and relationship with certain corporations, and the investment strategy employed to manage Plaintiffs' accounts was contrary to their explicit instructions. Their loss, therefore, was proximately caused by the investment decisions implemented by Dr. Black, in contravention of Plaintiffs' express instructions and statements concerning their investment goals. Alexander Black does not contest this.

Instead, his argument concerning loss causation – like his argument with respect to the '34 Act claim – rests on his contention that he, personally, did not make any material misrepresentations or take any investment decisions on those accounts. However, while Alexander Black's involvement within Interinvest goes to the existence (or lack thereof) of a duty owed to the Plaintiffs, it does not directly speak to loss causation. Indeed, Plaintiffs' claims against Alexander Black rest on the contention that he had a duty, as CCO, to investigate and prevent Dr. Black from acting to the Plaintiffs' detriment. The breach of this duty, then, caused the Plaintiffs' loss. If there was a duty, this evidence is

sufficient to raise a genuine issue of material fact as to causation.

Consequently, as with the '34 Act claim, I find that there is a genuine issue of material fact with respect to loss causation.

## IV. CONCLUSION

For the reasons set forth above, I GRANT Alexander Black's motion [Dkt. No. 153] for summary judgment with respect to the Plaintiffs' claim under section 10(b) of the '34 Act, but DENY the motion for summary judgment with respect to the state-law negligence claim.

In light of the disposition of this motion, the parties shall consult and provide a status report on or before Friday, April 19, 2019, addressing any further action — including trial (with proposed trial dates) — that must be undertaken to bring this case with respect to Alexander Black to final judgment. A status conference thereon will be held on Thursday, April 25, 2019 at 2:00 p.m. in Courtroom 1.

Further, counsel for Plaintiffs shall file a separate status report on or before Friday, April 19, 2019, addressing whether the case against Mr. Schmidt in this court should be closed, given the pending claims brought by Plaintiffs against Mr. Schmidt in the Bankruptcy Court of the District of Vermont, which appears to be able to provide the damages for resolution

on the merits Plaintiffs initially sought in this court.  *See supra* note 5.


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE